**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division**

**PATERNO A. DIMAANO,**

      **Plaintiff,**

    **v.**                                     **Civil Action No. 3:23-cv-312**

**VIRGINIA CENTER FOR
BEHAVIORAL REHABILITATION,**

      **and**

**ROYACE M. BAUGH, JR.,**
**in his official capacity,**

      **Defendants.**

## <u>MEMORANDUM OPINION</u>

This matter comes before the Court on Defendants the Virginia Center for Behavioral Rehabilitation ("VCBR") and Royace M. Baugh, Jr.'s (collectively, the "Defendants") Motion to Dismiss Amended Complaint (the "Motion to Dismiss" or "Motion").[1] (ECF No. 27.)  Plaintiff Paterno A. Dimaano responded in opposition to the Motion, (ECF No. 29), and Defendants replied, (ECF No. 30).

The matter is ripe for disposition.  The Court dispenses with oral argument because the materials before it adequately present the facts and legal contentions, and argument would not aid in the decisional process.

For the reasons that follow, the Court will grant in part and deny in part the Motion. (ECF No. 27.)  The Court will dismiss Counts One, Three, Four, Five, and Six in their entirety.

---

[1] The Court employs the pagination assigned by the CM/ECF docketing system.

The Court will dismiss Count Two to the extent Mr. Dimaano seeks reinstatement to his former position.

## I. Factual and Procedural Background[2]

Mr. Dimaano brings this action against Defendant Royace M. Baugh, Jr., the Director of Residential Services for the Virginia Center for Behavioral Rehabilitation, for violations of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101, *et seq.*, and against Defendant VCBR for violations of Title VII of the Civil Rights Act of 1964 ("Title VII"). (ECF No. 26, at 9–11.)

---

[2] In considering the Motion to Dismiss, (ECF No. 27), the Court will assume the well-pleaded factual allegations in the Complaint to be true and will view them in the light most favorable to Mr. Dimaano. *Mylan Labs., Inc. v. Matkari*, 7 F.3d 1130, 1134 (4th Cir. 1993); *see also Republican Party of N.C. v. Martin*, 980 F.2d 943, 952 (4th Cir. 1992).

Mr. Dimaano attached five exhibits to his proposed Amended Complaint, (ECF No. 22-1, at 13–22.) He failed to attach these five exhibits to his Amended Complaint, (ECF No. 26), but the Amended Complaint heavily relies on each exhibit, and quotes each one. (*See* ECF No. 26 ¶¶ 13, 15–16, 22–23, 26 (quoting all five exhibits); *Danik v. Hous. Auth. of Baltimore City*, 396 F. App'x 15, 16 (4th Cir. 2010) ("'[T]he complaint is deemed to include . . . documents incorporated in it by reference.'" (quoting *Cortec Indus., Inc. v. Sum Holding L.P.*, 949 F.2d 42, 47 (2d Cir. 1991))).

Mr. Dimaano later reattached the five exhibits to his Memorandum in Opposition to Motion to Dismiss Amended Complaint. (ECF Nos. 29-1–29-5.) Neither party disputes the exhibits' authenticity. *See Witthohn v. Fed. Ins. Co*, 164 F. App'x 395, 396–97 (4th Cir. 2006) (per curiam) (citations omitted) ("[A] court may consider official public records, documents central to plaintiff's claim, and documents sufficiently referred to in the complaint [without converting a Rule 12(b)(6) motion into one for summary judgment] so long as the authenticity of these documents is not disputed."). Defendants themselves cite heavily to Mr. Dimaano's exhibits in both their Brief in Support of Motion to Dismiss Amended Complaint, (ECF No. 28), and in their Reply in Support of Motion to Dismiss Amended Complaint, (ECF No. 30). The Amended Complaint is deemed to include the exhibits provided in ECF Nos. 29-1–29-5, and the Court will consider them without converting the Motion into one for summary judgment. *See Danik*, 396 F. App'x at 16; *Witthon*, 164 F. App'x at 396.

2

A.     **Factual Allegations**

On September 10, 2020, Mr. Dimaano began working as a Safety, Security and

Treatment Technician ("SSTT") at VCBR.  (ECF No. 26 ¶ 10.)  Eleven months later, on August

5, 2021, Mr. Baugh terminated Mr. Dimaano from this position.[3]  (ECF No. 26 ¶¶ 10, 27.)

Mr. Dimaano is of Asian heritage and Filipino national origin.  (ECF No. 26 ¶ 1.)  He

also is "a diabetic and must self-administer insulin injections five times per day."  (ECF No. 26

¶ 11.)  Although VCBR management cites to "unsatisfactory performance and failure to follow

policy" as the basis for the termination of his employment, Mr. Dimaano contends that his

termination resulted from discrimination based on disability, race, and national origin.  (ECF No.

26 ¶¶ 27, 37, 39, 41, 43, 45, 47.)

1.     **Mr. Dimaano's Accommodation to Self-Administer Insulin at
          Approximately 11:00 P.M. Each Shift**

Prior to his September 10, 2020 start date, Mr. Dimaano disclosed to VCBR's

management that due to his diabetes, he "must self-administer insulin injections five times per

day."  (ECF No. 26 ¶¶ 10–11.)  Mr. Dimaano's worked at VCBR from 2:00 p.m. until 12:30 a.m.

(ECF No. 26 ¶ 12.)  Mr. Dimaano explains that "[a]s an accommodation for his disability", he

took short breaks at "approximately 11:00 p.m." each night to self-administer insulin injections.

(ECF No. 26 ¶ 12.)

_____

[3] The Virginia Department of Behavioral Health and Development Services ("DBHDS")
operates Defendant VCBR.  (ECF No. 26 ¶ 2.)  VCBR "provides treatment and rehabilitation
services to sexually violent predators who have completed their incarceration sentences in order
to reduce their risk of reoffending."  (ECF No. 26 ¶ 2.)  At all times relevant to this action, Mr.
Baugh was "the Director of Residential Services of VCBR."  (ECF No. 26 ¶ 3.)

### 2.   Mr. Dimaano's Communications with VCBR Regarding Untimely Mid-Shift and End-of-Shift Relief

Throughout Mr. Dimaano's tenure at VCBR, the facility "was chronically short-staffed", "frequently" leaving Mr. Dimaano "without relief" to enable him to self-administer insulin injections, which caused his "diabetes [to] worsen[]" and his blood sugar to fluctuate heavily, causing body shakes.  (ECF No. 26 ¶¶ 12, 14.)  Mr. Dimaano "complained frequently of the lack of mid-shift relief to his superiors."  (ECF No. 26 ¶ 12.)

In his attached exhibits, Mr. Dimaano identifies several instances in which he complained to VCBR management on behalf of himself and fellow evening shift staff regarding a lack of end-of-shift relief.  (ECF Nos. 29-1, 29-2, 29-3.)  In the exhibits, Mr. Dimaano also identifies two instances in March and April 2021 when untimely mid-shift relief delayed his ability to administer an insulin shot by approximately two hours each time, about which he complained to VCBR management.  (ECF No. 29-1, at 1; ECF No. 29-2, at 1–2; ECF No. 26 ¶ 12).

#### a.   Mr. Dimaano's March 28, 2021 Email to VCBR Management

In Exhibit 1 to the Amended Complaint, Mr. Dimaano attaches an email from himself to VCBR management dated March 28, 2021.  (ECF No. 29-1.)  In the email, Mr. Dimaano raises complaints regarding (1) a lack of timely end-of-shift relief for evening shift Safety, Security and Treatment Technicians including himself; and (2) the lack of timely mid-shift relief on March 27, 2021, which delayed his nightly 11:00 p.m. insulin shot by approximately two hours.  (ECF No. 29-1, at 1; ECF No. 26 ¶ 12.)

Specifically, Mr. Dimaano writes that "between 20:30 until . . . around 00:22" on March 27, 2021, "SSTT[]s working the evening shift were left in their units with no reliever."  (ECF No. 29-1, at 1.)  Facing no relief, "shift staff . . . quietly hunkered down and did what we are supposed to do."  (ECF No. 29-1, at 1.)  Because he "did not want to abandon [his] post", he was

4

unable to timely "take his required insulin shot." (ECF No. 29-1, at 1.)  Specifically, because

Mr. Dimaano "did not get any relief from the night shift until 0:22", the lack of mid-shift relief

delayed his "approximately 11:00 p.m." nightly insulin shot by slightly over two hours. (ECF

No. 29-1, at 1; ECF No. 26 ¶ 12.)

   In his March 28, 2021 email, appearing to speak on behalf of SSTTs working the evening

shift, Mr. Dimaano addresses a lack of end-of-shift relief:  "We were disappointed and frustrated,

while at the same time betrayed by the people we were supposed to trust", and "the things I write

about are feelings of despair and helplessness that we all feel." (ECF No. 29-1, at 1.)  Mr.

Dimaano identifies a time when he needed end-of-shift relief at "03:00 to allow [him] to get

some sleep and drive" to a medical appointment, but no relief came before Mr. Dimaano left

VCBR at some point "past 4:00 [a.m.]" (ECF No. 29-1, at 1–2.)  He adds that it "has happened a

couple more times where, instead of being honest and truthful, [VCBR management] will resort

to deception and lies to keep us here." (ECF No. 29-1, at 2.)  He states that "[t]he evening shift

feels like we are being 'targeted' because we don't want to stay anymore", and "[w]e hope that

this can be handled professionally." (ECF No. 29-1, at 2.)  Mr. Dimaano concludes the March

28, 2021 email by writing:  "Thank you for your patience and please feel free to address us if you

have questions. We will be more than happy to help." (ECF No. 29-1, at 2.)

   **b.**  **Mr. Dimaano's April 28, 2021 Email to VCBR Management**

   Approximately one month later, on April 28, 2021, Mr. Dimaano again emailed VCBR

management. (ECF No. 29-2, at 2.)  In the email, Mr. Dimaano complains about (1) his concern

that his lack of shift relief is a "retaliatory effort" and he is being "singled out" because he used

facility computers post-shift to work on a training program for SSTTs and because he refuses

every request to work overtime; and (2) his concern that management takes "advantage of [his]

desire to help the facility"; and, (3) a lack of timely mid-shift relief on the evening of April 25, 2021, delaying his ability to administer his insulin shot by almost two hours. (ECF No. 29-2, at 1–2.)

In this April 28, 2021 email to "VCBR Director Jason Wilson and Facilities Manager Andrew Keup" with the subject line "Relief issue on April 25, 2021", Mr. Dimaano "inform[s]" Mr. Wilson and Mr. Keup that he was denied mid-shift relief on April 25, 2021, delaying his ability to self-administer an insulin shot by nearly two hours. (ECF No. 29-2, at 1–2; ECF No. 26 ¶¶ 12, 15.) Mr. Dimaano states that when management told him that he "may need to stay" after the end of his shift on April 25, 2021, Mr. Dimaano responded that he was unable to do so because he "just had a death in the family" and his family was "conducting online Masses and Novena prayers for the departed twice daily for 9 days." (ECF No. 29-2, at 2.) Also when he asked for relief to self-administer his insulin shot, someone told him "that a reliever was coming", (ECF No. 29-2, at 2), but that he "had to call for a relief and a break almost every 10 minutes", and received a break at approximately "00:45," after which he went to the breakroom "to take [his] insulin and grab a snack as [his] blood sugar had already dropped." (ECF No. 29-2, at 2) This was nearly two hours after Mr. Dimaano's regularly scheduled "approximately 11:00 p.m." dose. (ECF No. 26 ¶ 12.)[4]

---

[4] Mr. Dimaano asserts in his Amended Complaint that on July 9, 2021, he "was again denied relief to administer his insulin injection while other units of VCBR were afforded relief for shift breaks." (ECF No. 26 ¶ 22 (citing Exhibit 3 of the Amended Complaint).) Exhibit 3 of the Amended Complaint, however, directly contradicts this assertion, and more broadly relates to Mr. Dimaano's frustrations regarding end-of-shift relief. (ECF No. 29-3, at 1.) In his opposition, Mr. Dimaano reasserts that he was denied relief to administer insulin because his 11:00 p.m. July 9, 2021 insulin break was not "sanctioned by VCBR management" because he "asked a fellow SST[T] to cover for him." (ECF No. 29, at 3.) Nowhere in the Amended Complaint or exhibits, however, does Mr. Dimaano allege that only specific personnel could relieve him for his insulin break. Additionally, Mr. Dimaano's allegations do not address whether "Officer Allen from Transportation", (ECF No. 29-3, at 1), worked as a SSTT.

**c.    VCBR Management's Response to Mr. Dimaano's April 28, 2021 Email**

The next day, on April 29, 2021, Mr. Dimaano's supervisor forwarded Mr. Dimaano's

email to Larry Crocker, who was VCBR's Director of Resident Services at the time, and Mr.

Baugh. (ECF No. 29-2, at 2.)  That same day, Mr. Baugh responded thanking Mr. Dimaano "for

bringing [his] concerns to our attention." (ECF No. 29-2, at 1.)  Mr. Baugh wrote in relevant

part:

> I want to ensure that your concerns regarding any operational issues such as relief
> for your insulin shots, post assignments and operational decisions that you feel are
> retaliatory in nature are being addressed . . . . I have spoken to the night shift
> Facility Manager about your medical accommodations and they will try their level
> best to get you relief in a timely manner as well as evening shift . . . . I want you
> to know that your experiences in other organizations and expertise in areas of
> management is welcomed.

(ECF No. 29-2, at 1.)  In response, Mr. Dimaano thanked Mr. Baugh and asked for his

time to discuss a project that Mr. Dimaano was working on. (ECF No. 29-2, at 1.)

**d.    Mr. Dimaano's July 12, 2021 Email to VCBR Management**

On July 12, 2021, approximately ten weeks after the April 29 exchange, Mr.

Dimaano emailed Mr. Keup and other Virginia Department of Behavioral Health and

Development Services ("DBHDS") employees with the subject line "Incident report for

early morning of 07.10.21 on Unit 1B." (ECF No. 29-3, at 1.)  In this email, Mr.

Dimaano writes that on July 9, 2024 "[a]t around 23:00 two Transportation personnel

came to relieve SSTT Foster at 1A so she can take a break" and "Officer Allen from

---

The Court cannot credit the reading of the July 9 communication in the manner Mr.
Dimaano desires even reading his Amended Complaint favorably. *See Fayetteville Inv'rs v.
Commercial Builders, Inc.*, 936 F.2d 1462, 1465 (4th Cir. 1991) ("[I]n the event of conflict
between the bare allegations of the complaint and any attached exhibit . . . , the exhibit
prevails.").

Transportation[] asked [Mr. Dimaano] if [he] needed to take [his] insulin shots." (ECF
No. 29-3, at 1.)  After saying yes, Mr. Dimaano asked "if [Officer Allen] would be so
kind to relieve [him] so [he] can take [his] shot." (ECF No. 29-3, at 1.)  Officer Allen
agreed but told Mr. Dimaano "to return immediately as he will not be staying for the
night and that he will leave at 02:30." (ECF No. 29-3, at 1.)  Mr. Dimaano "returned to
the unit in about 15 minutes as [he] wanted to keep [his] word to Officer Allen." (ECF
No. 29-3, at 1.)  Mr. Dimaano adds that because he had a cardiac imaging appointment
scheduled the next morning at 9:00 a.m., he asked for a reliever several times after
midnight without success. (ECF No. 29-3, at 1.)  Mr. Dimaano writes:

> Why are the Night Shift manager[s] always singling me out?  There is so much
> frustration that I was even written up one time for attempting to unionize the
> SSTT[]s when all I was doing was defending the facility from all the confusing
> information being released by HR and management.  I was at the breakroom to
> take my insulin shot and I was singled out.  I know this for a fact as I have asked
> all the people who were there that night and none of them have been informed nor
> written up.
>
> This incident has caused me and my family so much frustration that I almost do
> not want to come to work for fear that I will not be relieved.  There is not even
> any advi[c]e coming from management that my relief is late or what time it is
> expected.  Is it because of my race being Asian that I am being singled out? . . . I
> have full faith in my supervisors in the evening shift, hence my opening up to
> you.  However, I have so much frustration and reservation towards my night shift
> supervisor.  At times, it even makes me think that they are retaliating for some
> slight I may have committed.

(ECF No. 29-3, at 1–2.)

### 3. VCBR's Investigation into Mr. Dimaano's Contact with a Previous Resident and Subsequent Termination

In "mid-June 2021, [Mr.] Dimaano received a text message from an unknown individual
asking for assistance in securing a job." (ECF No. 26 ¶ 18.)  The individual addressed Mr.
Dimaano incorrectly as "Mr. Dominique." (ECF No. 26 ¶ 18.)  Mr. Dimaano responded asking

who the sender was, and "quickly discovered" that the sender "was a former VCBR resident." (ECF No. 26 ¶ 18.)  Mr. Dimaano "did not respond" further and informed his supervisor, Mr. Keup, about the text exchange the next day.  (ECF No. 26 ¶ 18.)  Mr. Keup then "advised Dimaano not to communicate with this resident and [Mr. Dimaano] complied."  (ECF No. 26 ¶ 18.)  Mr. Dimaano had distributed his business card for his firearms safety side business, which lists his personal cell phone number, to VCBR employees.  (ECF No. 26 ¶ 26.)  Mr. Dimaano speculates that "the former resident may have learned his cell phone number from his business card."  (ECF No. 26 ¶ 26.)

On July 2, 2021, VCBR opened an investigation into Mr. Dimaano's text exchange with the former VCBR resident.  (ECF No. 26 ¶ 19.)  During the investigation, VCBR's Director of Security, Nathan Moore, interviewed Mr. Dimaano.  (ECF No. 26 ¶ 19.)  During the interview, Mr. Moore told Dimaano:  "'I really don't care where you come from, but this is how we do it here.'"  (ECF No. 26 ¶ 19.)[5]  After the interview, Mr. Dimaano asked Director of Residential Services Larry Crocker about next steps.  (ECF No. 26 ¶ 20.)  Mr. Crocker asked "[Mr.] Dimaano to return to normal duties", and noted that Mr. Dimaano's "Unit Manager may ask him to review Facility Instructions."  (ECF No. 26 ¶ 20.)  Five days later, Mr. Dimaano received "his nine-month job performance evaluation", which gave him the "highest rating" of "'Contributor.'"  (ECF No. 26 ¶ 21.)  Based on Mr. Dimaano's September 10, 2021 start-date, the nine-month performance evaluation covered the nine-month time period from September 10, 2020 through approximately June 10, 2021.

---

[5] In paragraph 34 of the Amended Complaint, Mr. Dimaano reasserts this allegation with a slight variation, stating that Mr. Moore told him:  "I really don't care where you **came** from, but this is how we do it here."  (ECF No. 26 ¶ 34 (emphasis added).)

9

In late July 2021,[6] approximately two to three weeks after his job evaluation, Mr.

Dimaano received a Due Process Notice from Mr. Crocker and Mr. Keup.  (ECF No. 26 ¶ 23;

ECF No. 29-4.)  The Due Process Notice is dated July 20, 2021.  (ECF No. 29-4, at 1.)  It

provides in relevant part:

> [VCBR] is considering conducting Formal Disciplinary actions up to and
> including termination, for your violation of State Policy and Facility Instructions.
> Specifically, for violating (Facility Instruction No. 503, Staff and Resident
> Interactions and Boundaries), (IAW – Inappropriate Interactions), (Facility
> Instruction No. 504 Guidance on Ethical Codes of Conduct and Practices), (IAW
> General Ethical Principles), [b]eing in contact with residents outside normal work
> hours.[]  On a number of occasions, you engaged in a behavior directed towards a
> resident which has been determined to be unethical.[]
>
> Please provide a written response by 5:00 [p.m.] on 29 July 2021 of any
> mitigating circumstances or supporting information for us to consider. . . .  I have
> scheduled a meeting at 9:00 [a.m.] on 3 August 2021, for us to discuss this matter
> and notify you of our decision.

(ECF No. 29-4, at 1.)  Mr. Dimaano states that "[t]his charge was unfounded and not

supported by evidence", and the only contact he had with a VCBR "resident outside work

hours was the unsolicited text message that he received from a former resident seeking

employment assistance."  (ECF No. 26 ¶ 24.)  He further states that "immediately after

the Due Process Notice was issued", Mr. Keup told Mr. Dimaano:  "'I want you to know

that this is not what I want. This is coming from the top.'"  (ECF No. 26 ¶ 25.)  The same

day the Due Process Notice is dated, July 20, 2021, Mr. Dimaano states that Mr. Crocker

---

[6] The Due Process Notice is dated July 20, 2021.  (ECF No. 29-4, at 1.)  In his Amended
Complaint, Mr. Dimaano states that he "was issued" the Due Process Notice that same day.
(ECF No. 26 ¶ 23.)  In Exhibit 5 to the Amended Complaint (which Mr. Dimaano incorrectly
labels "Defendant's Exhibit 6") Mr. Dimaano, inconsistently, writes in a July 28, 2021 letter to
Mr. Keup that he was "issued" the Due Process Notice on July 27, 2021.  (ECF No. 29-5, at 1.)

The exact date on which Mr. Dimaano received the Due Process Notice is immaterial to
the Court's resolution of the Motion, (ECF No. 27), because no party asserts that the precise date
would impact whether Mr. Dimaano has stated a claim upon which relief can be granted.

"advis[ed]" him not to return to work "until [he is] called back to report for duty." (ECF No. 29-5, at 2.)

On July 28, 2021, Mr. Dimaano responded to the Due Process Notice via letter to Mr. Keup. (ECF No. 26 ¶ 26.)  In the letter, Mr. Dimaano explains that "in good faith, [he] was not aware that [his] actions violated [VCBR's] Facility Instructions." (ECF No. 29-5, at 1.)  He adds that he "[u]understand[s] that ignorance of the rule does not excuse [him]", but emphasizes that his "interaction with the former resident" was "innocent." (ECF No. 29-5, at 1.)  Mr. Dimaano acknowledges in the letter that his personal "cellphone number is on [his] business card", and that he considers his cellphone number "a business phone." (ECF No. 29-5, at 1.)  He further states that he has never had "any type of relationship with a former resident." (ECF No. 29-5, at 1.)  He explains that after the former VCBR resident contacted him "for assistance in looking for a job", he informed his "immediate supervisors to not only report the incident but also to seek guidance." (ECF No. 29-5, at 1.)  He then "immediately stopped contact with the former resident" due to "counsel of [his] immediate supervisors." (ECF No. 29-5, at 1.)

Mr. Dimaano also acknowledges in the July 28, 2021 letter that he "may have been vocal with criticisms in some practices within the facility but [has] always been up-front and candid with them", and his "only desire is to help improve our efficiencies and be better public servants." (ECF No. 29-5, at 2.)  Mr. Dimaano remarks that he has "been disadvantaged several times, but [has] not done anything about those situations, other than to make sure that they are reported and recorded properly." (ECF No. 29-5, at 2.)  Mr. Dimaano states that "[n]one of these things were treated personally and [it] is a workplace disagreement in my mind." (ECF No. 29-5, at 2.)

On August 5, 2021, Mr. Baugh terminated Mr. Dimaano's employment, citing "unsatisfactory performance and failure to follow policy." (ECF No. 26 ¶ 27.) On August 23, 2021, Mr. Dimaano reviewed his personnel file and noticed several missing documents. (ECF No. 26 ¶ 28.) A Human Resources employee "told [Mr.] Dimaano that the missing documents were in a 'supervisory file,' which he could request." (ECF No. 26 ¶ 28.) Although "[Mr.] Dimaano requested" these documents, he "never received them." (ECF No. 26 ¶ 28.) Additionally, "[o]n August 23, 2021, [Mr.] Dimaano filed a grievance for disability and race discrimination." (ECF No. 26 ¶ 29.) VCBR transferred Mr. Dimaano's grievance "to the Diversity, Equity and Inclusion Office of the Department of Human Resources Management." (ECF No. 26 ¶ 29.) Mr. Dimaano "received no response to his claim of discrimination." (ECF No. 26 ¶ 29.)

**B.**     **Procedural Background**

On February 10, 2022, Mr. Dimaano filed an "administrative Charge of Discrimination with the U.S. Equal Employment Opportunity Commission" ("EEOC"). (ECF No. 26 ¶ 7.) "On March 6, 2023, the U.S. Department of Justice, Civil Rights Division, issued [Mr.] Dimaano a Notice of Right to Sue within 90 Days." (ECF No. 26 ¶ 8.)

On May 8, 2023, Mr. Dimaano filed a Complaint against Defendants VCBR and Mr. Baugh. (ECF No. 1.) On September 19, 2023, Defendants filed a Motion to Dismiss the Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6). (ECF No. 18.) On November 3, 2023, Mr. Dimaano filed a Motion for Leave to File Amended Complaint (the "Motion for Leave to Amend"). (ECF No. 22.) On November 17, 2023, Defendants responded, stating that they did not object to the Motion for Leave to Amend. (ECF No. 24, at 1.) On November 21,

2023, the Court granted the Motion for Leave to Amend, and Mr. Dimaano filed an Amended

Complaint that same day.  (ECF Nos. 25, 26.)

In the Amended Complaint, Mr. Dimaano asserts three causes of action under the ADA

against Mr. Baugh and three causes of action under Title VII against VCBR:

| Count I: | Mr. Baugh "discharge[ed] [Mr.] Dimaano because of his disability," in violation of the ADA, 42 U.S.C. § 12101,  et seq. |
| --- | --- |
| Count II: | Mr. Baugh "fail[ed] to accommodate [Mr.] Dimaano's disability by failing to afford him shift breaks to self-administer insulin shots, despite repeated demands," in violation of the ADA, 42 U.S.C. § 12101, et seq., and 29 C.F.R. § 1630.2(o)(3). |
| Count III: | Mr. Baugh "terminat[ed] [Mr.] Dimaano in retaliation for complaining about VCBR's refusal to grant his requested accommodations for his disability," in violation of the ADA, 42 U.S.C. § 12101, et seq. |
| Count IV: | VCBR "discharg[ed] [Mr.] Dimaano" due to "discrimination against his Asian race," in violation of his rights under Title VII, as amended, 42 U.S.C. § 2000e-2. |
| Count V: | VCBR "discharg[ed] [Mr.] Dimaano" due to "discrimination against his Filipino national origin," in violation of Title VII, as amended, 42 U.S.C. § 2000e-2. |
| Count VI: | VCBR "terminat[ed] [Mr.] Dimaano for [his] complaint of disparate treatment" due to "his Asian race and Filipino national origin," in violation of Title VII, as amended, 4 U.S.C. § 2000e-3. |

(ECF No. 26 ¶¶ 37, 39, 41, 43, 45, 47.)

On December 5, 2023, Defendants timely filed the Motion to Dismiss.  (ECF No. 27.)

Mr. Dimaano responded, (ECF No. 29), and Defendants replied, (ECF No. 30).

For the reasons articulated below, the Court will grant in part and deny in part the

Motion.  (ECF No. 27.)  The Court will dismiss Counts One, Three, Four, Five, and Six in their

13

entirety.  The Court will dismiss Count Two against Mr. Baugh to the extent Mr. Dimaano seeks reinstatement to his former position.

## II.  Standard of Review

### A.  Rule 12(b)(6)

"A motion to dismiss under Rule 12(b)(6) tests the sufficiency of a complaint; importantly, it does not resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses." *Republican Party of N.C. v. Martin*, 980 F.2d 943, 952 (4th Cir. 1992) (citing 5A Charles A. Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1356 (1990)).  To survive Rule 12(b)(6) scrutiny, a complaint must contain sufficient factual information to "state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007); *see also* Fed. R. Civ. P. 8(a)(2) ("A pleading that states a claim for relief must contain . . . a short and plain statement of the claim showing that the pleader is entitled to relief.").  Mere labels and conclusions declaring that the plaintiff is entitled to relief are not enough. *Twombly*, 550 U.S. at 555.  Thus, "naked assertions of wrongdoing necessitate some factual enhancement within the complaint to cross the line between possibility and plausibility of entitlement to relief." *Francis v. Giacomelli*, 588 F.3d 186, 193 (4th Cir. 2009) (quoting *Twombly*, 550 U.S. at 557) (internal quotation marks omitted).

A complaint achieves facial plausibility when the facts contained therein support a reasonable inference that the defendant is liable for the misconduct alleged. *Twombly*, 550 U.S. at 556; *see also Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  This analysis is context-specific and requires "the reviewing court to draw on its judicial experience and common sense." *Giacomelli*, 588 F.3d at 193 (citation omitted).  The court must assume all well-pleaded factual allegations to be true and determine whether, viewed in the light most favorable to the plaintiff,

14

they "plausibly give rise to an entitlement to relief." *Iqbal*, 556 U.S. at 679; *see also Kensington Volunteer Fire Dep't, Inc. v. Montgomery Cnty., Md.*, 684 F.3d 462, 467 (4th Cir. 2012) (concluding that the court in deciding a Rule 12(b)(6) motion to dismiss "'must accept as true all of the factual allegations contained in the complaint' and 'draw all reasonable inferences in favor of the plaintiff'" (quoting *E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, 637 F.3d 435, 440 (4th Cir. 2011))).

### III.  Analysis

Defendants seek relief on three grounds:  (1) Mr. Dimaano fails to state a claim under the ADA; (2) VCBR is not an entity capable of being sued; and, (3) even if VCBR were capable of being sued or Mr. Dimaano had sued the proper entity, Mr. Dimaano still fails to state a claim under Title VII.  (ECF No. 28, at 7, 14.)

Accepting Mr. Dimaano's factual allegations as true and drawing all reasonable inferences in his favor, as the Court must do at the motion to dismiss stage, Mr. Dimaano fails to state the majority of his claims in his Amended Complaint.  Mr. Dimaano fails to state claims under the ADA for wrongful discharge or retaliation (Counts One and Three).  (ECF No. 26 ¶¶ 37–38, 41–42.)  Although he, just barely, states a claim under the ADA for failure to accommodate, (Count Two), he fails to plausibly allege that VCBR's failure to accommodate caused his discharge, or even contributed to his discharge.  (ECF No. 26 ¶¶ 39–40.)  Accordingly, Count Two will be dismissed to the extent Mr. Dimaano requests reinstatement to his former position.

Furthermore, VCBR is not an entity of being sued and even if it were, or even if Mr. Dimaano had sued the correct entity, Mr. Dimaano fails to state any claim under Title VII (Counts Four, Five, and Six).  (ECF No. 26 ¶¶ 43–48.)  The Court denies Mr. Dimaano's request

15

to file a Second Amended Complaint to substitute a different entity for VCBR because such an amendment would be futile.  (ECF No. 29, at 12.)

### A.   Mr. Dimaano Fails to State the Majority of his ADA Claims

Mr. Dimaano brings Counts One, Two, and Three of the Amended Complaint under the ADA against Mr. Baugh for (1) discharging him due to his disability; (2) failing to accommodate his disability by failing to give him shift breaks to self-administer insulin shots; and, (3) retaliating against him for complaining about VCBR's failure to accommodate his disability.  (ECF No. 26 ¶¶ 37, 39, 41.)  Because he does not plausibly connect his disability or his requests for accommodation to his discharge, Mr. Dimaano fails to state a claim under the ADA for wrongful discharge (Count One) or retaliation (Count Three).  (ECF No. 26 ¶¶ 37–38, 41–42.)  Although he does state a claim under the ADA for failure to accommodate (Count Two), he does not plausibly allege that he is entitled to reinstatement due to this failure.  (ECF No. 26 ¶¶ 39–40.)

### 1.   Mr. Dimaano Fails to State a Claim for Wrongful Discharge

Mr. Dimaano fails to state a claim for wrongful discharge for two reasons.  First, he does not plausibly allege that at the time of his August 5, 2021 discharge, he was performing at a level that met VCBR's legitimate expectations.  Second, he fails to plausibly allege that his disability was a "but-for" cause of his discharge.  Even presuming the allegations to be true and reading them in Mr. Dimaano's favor, the exhibits to Mr. Dimaano's Amended Complaint suggest non-discriminatory reasons for his discharge.  The Court will dismiss Count One of the Amended Complaint.  (ECF No. 26.)

a.    **Legal Standard:  Wrongful Discharge in Violation of the ADA**

The ADA states that "[n]o covered entity shall discriminate against a qualified individual

on the basis of disability in regard to . . . [the] discharge of employees."  42 U.S.C. § 12112(a).[7]

To state a claim of wrongful discharge for an ADA violation, a plaintiff must satisfy the

following elements:

> (1) he [or she] is within the ADA's protected class . . . ; (2) he [or she] was
> discharged; (3) at the time of his [or her] discharge, he [or she] was performing
> the job at a level that met his [or her] employer's legitimate expectations; and (4)
> his [or her] discharge occurred under circumstances that raise a reasonable
> inference of unlawful discrimination.

*Smith v. Amazon.com.kydc, LLC*, No. 3:18CV170 (MHL), 2018 WL 3014799, at *4 (E.D. Va.

June 15, 2018) (alterations in original) (quoting *Wells v. BAE Systems Norfolk Ship Repair*, 483

F. Supp. 2d 497, 507 (E.D. Va. 2007) (considering 12(b)(6) motion to dismiss), *aff'd*, 747 F.

App'x 172 (4th Cir. 2019).

A plaintiff falls "within the ADA's protected class if [he or she] is 'a qualified individual

with a disability.'"  *Haulbrook v. Michelin N. Am.*, 252 F.3d 696, 702 (4th Cir. 2001) (quoting

42 U.S.C.A. § 12112).  "The ADA defines 'disability' as a physical or mental impairment that

substantially limits one or more of the major life activities of an individual, a record of such an

impairment, or being regarded as having such an impairment." *Id.* (citing 42 U.S.C.A.

§ 12102(2).)

---

[7] Section 12112 states, in pertinent part:

(a) GENERAL RULE
No covered entity shall discriminate against a qualified individual on the basis of
disability in regard to job application procedures, the hiring, advancement, or
discharge of employees, employee compensation, job training, and other terms,
conditions, and privileges of employment.

42 U.S.C. § 12112(a).

A qualified individual is "an individual who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8). When determining whether an employee is a "qualified individual" under the ADA, courts consider whether the employee "'can perform the essential functions of the employment position that such individual holds or desires.'" *Jones v. HCA*, 16 F. Supp. 3d 622, 632 (E.D. Va. 2014) (quoting 42 U.S.C. § 12111). "The 'essential functions' are those 'fundamental job duties of the employment position.'" *Id.* (quoting 29 C.F.R. § 1630.2(n)(2)). At the motion to dismiss stage, courts in this district have not required plaintiffs to allege their essential job functions to successfully allege that they are qualified individuals. *See, e.g., Webb v. Chesterfield Cnty., Va.*, No. 3:19-CV-00183 (JAG), 2019 WL 2992011, at *2 (E.D. Va. July 8, 2019); *Jones*, 16 F. Supp. 3d at 632. Rather, courts "focus[] on whether a plaintiff has alleged that he [or she] could perform the essential functions" of his or her position. *Webb*, 2019 WL 2992011, at *2 (firefighter plausibly alleged that he was a "qualified individual" under the ADA where he "[did] not allege the essential functions of his position as a firefighter", but alleged that he worked as a firefighter without incident while experiencing a lack of accommodation for his PTSD) (citing *Jones*, 16 F. Supp. 3d at 632 and *Sumner v. Mary Washington Healthcare Physicians*, No. 3:15CV42 (MHL), 2016 WL 5852856, at *6 (E.D. Va. Sept. 30, 2016)).

"To raise a reasonable inference of disability discrimination in a wrongful discharge case, an employee must allege that his [or her] disability was a 'but-for' cause of his [or her] termination." *Kelly v. Town of Abingdon, Virginia*, 90 F.4th 158, 169 (4th Cir. 2024) (citing *Gentry v. E.W. Partners Club Mgmt. Co.*, 816 F.3d 228, 235–36 (4th Cir. 2016). "'The mere fact that a certain action is potentially consistent with discrimination does not alone support a

18

reasonable inference that the action was motivated by bias.'" *Id.* (quoting *Bing v. Brivo Sys., LLC*, 959 F.3d 605, 618 (4th Cir. 2020)).  If a court must "speculate to fill in the gaps regarding the defendant's motive, the circumstances do not warrant a reasonable inference of discrimination." *Id.* (cleaned up) (citation omitted).

> **b.    Mr. Dimaano Fails to Establish that VCBR Discharged Him Due to His Disability**

Mr. Dimaano fails to show that (1) at the time of his discharge, he was performing at a level that met VCBR's legitimate expectations, and (2) his discharge occurred under circumstances that raise a reasonable inference of unlawful discrimination.  He therefore fails to satisfy elements three and four of a wrongful discharge claim under the ADA, and Count One must be dismissed. *See Smith*, 2018 WL 3014799, at *4.

Mr. Dimaano does, however, establish the first and second elements of Count One, *i.e.*, that (1) he falls within the ADA's protected class as a qualified individual with a disability, and (2) he was discharged.  (ECF No. 28, at 8.)  Element two is undisputed.  (ECF No. 28, at 8.)  Regarding element one, Mr. Dimaano plausibly alleges that he has a disability under the ADA.[8]

The Court will first address why Mr. Dimaano plausibly alleges that he is a "qualified individual" who can perform the "essential functions" of his job at VCBR before discussing why

---

[8] "[T]he ADA defines a 'disability' as including . . . a physical or mental impairment that substantially limits one or more major life activities.'" *Akbar-Hussain v. ACCA, Inc.*, No. 1:16CV1323 (JCC/IDD), 2017 WL 176596, at *3 (E.D. Va. Jan. 17, 2017) (quoting 42 U.S.C. § 12102(1) and citing 29 C.F.R. § 1630.2(g)(1)(i)–(iii)); *see also* 29 C.F.R. § 1630.2(j)(3)(iii) ("[A]pplying the principles set forth [herein], it should easily be concluded that the following types of impairments will, at a minimum, substantially limit the major life activities indicated: . . . diabetes substantially limits endocrine function . . . .").  Here, Mr. Dimaano alleges that his diabetes is a "physical impairment" that "'substantially limits one or more [] major life activities' . . . including eating, sleeping, walking, standing, breathing, thinking, communicating and working" if left untreated.  (ECF No. 26 ¶ 30 (quoting 42 U.S.C. § 12102(1)(a).)  As such, Mr. Dimaano plausibly alleges that he has a disability under the ADA.

19

he fails to plausibly allege elements three or four of Count One. 42 U.S.C. § 12111.[9] In their

Reply, Defendants contend that Mr. Dimaano does not show that he is a "qualified individual"

under the ADA because he does not articulate the essential functions of his job, nor does he

allege any facts demonstrating that he could perform the essential functions of his position with

or without a reasonable accommodation. (*See* ECF No. 30, at 5–6 (citing *Taylor v. Revature,*

*LLC*, No. 1:22-cv-1153 (RDA/JFA), 2023 WL 6445857, at *5 n.7 (E.D. Va. Sept. 28, 2023)).)

For instance, in *Taylor*, the plaintiff failed to allege *any* facts "plausibly support[ing] that [the]

[p]laintiff had a record of disability" at all, thereby failing to establish that she was within the

ADA's protected class as a qualified individual with a disability. 2023 WL 6445857, at *6–7.

As a result, the court dismissed the plaintiff's ADA claims, including plaintiff's wrongful

discharge claim. *Id.* at *7.

　　Although Mr. Dimaano does not provide specific details about the "essential functions"

of his role, despite Defendants' suggestion otherwise, he does not need to. *See, e.g.*, *Webb*, 2019

WL 2992011, at *2; *Jones*, 16 F. Supp. 3d at 632. Mr. Dimaano plausibly alleges that he is

capable of performing the essential functions of his position with or without a reasonable

accommodation. He does so by alleging that at his nine-month performance review, despite

being "frequently" prevented "from taking his insulin injections", he received "an overall rating

---

[9] In their Brief in Support of the Motion to Dismiss, Defendants do not explicitly challenge whether Mr. Dimaano plausibly alleges that he is a "qualified individual". (ECF No. 28, at 8 (contending that Mr. Dimaano's "claim in Count [One] fails because he has not alleged facts showing either the third or fourth elements of his claim").) However, Defendants cite two cases in which courts dismissed plaintiffs' wrongful discharge claims because the plaintiffs failed to allege that they were "qualified individuals" thereby failing to satisfy element one of their respective wrongful discharge claims. (See ECF No. 28, at 9–10 (citing *Akbar-Hussain v. ACCA, Inc.*, 2017 WL 176596, at *3–4 (E.D. Va. Jan. 17, 2017) and *Kelly v. Town of Abingdon*, 437 F. Supp. 3d 517, 527–28 (W.D. Va. 2020)).) In their Reply brief, Defendants explicitly argue that Count One fails because Mr. Dimaano does not "sufficiently allege that he is a qualified individual." (ECF No. 30, at 5.) This argument cannot prevail.

of 'Contributor,' the highest rating." (ECF No. 26 ¶¶ 12, 21); *see Webb*, 2019 WL 2992011, at *2 (firefighter plausibly alleged that he was a "qualified individual" under the ADA where he "[did] not allege the essential functions of his position as a firefighter", but alleged that he worked as a firefighter without incident while experiencing a lack of accommodation for his PTSD).

The Court now turns to element three—whether at the time of his discharge, Mr. Dimaano was performing at a level that met VCBR's legitimate expectations. *See Smith*, 2018 WL 3014799, at *4. Despite plausibly alleging that he was *capable* of performing the essential functions of his role in his first nine months at VCBR, as reflected by his positive nine-month performance review, Mr. Dimaano fails to demonstrate, even reading his allegations favorably, that at the time of his August 5, 2021 discharge, he was *in fact* meeting VCBR's legitimate expectations. *See id.*

First, Mr. Dimaano admits that he was "written up one time for attempting to unionize the SSTT[]s", although he contends that "all [he] was doing was defending the facility from all the confusing information being released by HR and management." (ECF No. 29-3, at 1.)[10] Second, Mr. Dimaano admits that his personal cellphone number is on "his business card for a firearms safety side business that he had handed out to various VCBR employees", and posits that a "former resident may have learned his cell phone number from his business card." (ECF No. 26 ¶ 26.) And third, Mr. Dimaano further admits that, possibly as a result of a former VCBR resident discovering his personal cellphone number from his business card, and in contravention of VCBR policy, he had contact with the former VCBR resident outside work hours when the

---

[10] Additionally, although VCBR was "chronically short-staffed", he admits that he declined "every request to work overtime for the night shift." (ECF No. 26 ¶ 12; ECF No. 29-2, at 1.)

former resident sent him an "unsolicited text message . . . seeking employment assistance." (ECF No. 26 ¶ 24; ECF No. 29-5, at 1.)  Although Mr. Dimaano acknowledges in a letter to VCBR's Facility Manager that he "was not aware that [his] actions violated" VCBR policy and emphasizes that his "interaction with the former resident" was "innocent", he further acknowledges that he "[u]nderstand[s] that ignorance of the rule does not excuse [him]." (ECF No. 29-5, at 1.)

On July 2, 2021, VCBR opened an investigation in response to his self-reported contact with a former resident, which resulted in a July 20, 2021 Due Process Notice discussing the incident and a request from his manager that same day that he cease reporting to work until instructed otherwise.  (ECF No. 26 ¶¶ 19, 23; ECF No. 29-4, at 1; ECF No. 29-5, at 2.)  Five days after VCBR opened the investigation but before VCBR issued the Due Process Notice, VCBR gave Mr. Dimaano a nine-month performance evaluation with the overall rating of "Contributor," the highest rating.  (ECF No. 26 ¶ 21.)  Notwithstanding this positive nine-month review,[11] on August 5, 2021, Mr. Baugh terminated Mr. Dimaano's employment, citing his "unsatisfactory performance and failure to follow policy" as a basis for his termination.  (ECF No. 26 ¶¶ 21, 27.)  These allegations fail to establish that *at the time his employment was terminated*, Mr. Dimaano was performing at a level that met VCBR's legitimate expectations.

Second, Mr. Dimaano provides no factual allegations in the Amended Complaint that raise a reasonable inference of disability-based discrimination.  Mr. Dimaano offers the conclusory assertion that Mr. Baugh "discharg[ed] [him] because of his disability", (ECF No. 26

---

[11] Notably, because Mr. Dimaano commenced work at VCBR on September 10, 2020, the Court can reasonably infer that his "nine-month performance" evaluation covered the period from September 10, 2020 through approximately June 10, 2021.  This time period pre-dates the "mid-June 2021" text from a former VCBR resident and subsequent July 2, 2021 investigation.

¶ 37), but fails to plausibly allege that his disability was a but-for cause of his termination. *See Kelly*, 90 F.4th at 169.  Mr. Dimaano broadly alleges that he was frequently denied mid-shift relief to take his insulin injections, but only identifies two instances—March 28, 2021 and April 28, 2021—in which he complained to VCBR management regarding his lack of mid-shift relief preventing him from timely administering his insulin shot.  (ECF No. 26 ¶ 12; ECF No. 29-1, at 1; ECF No. 29-2, at 1–2.)  Mr. Dimaano does not allege that this lack of relief affected his job performance.  Additionally, both complaints occurred months before his mid-June 2021 contact with a former resident, the July 2, 2021 investigation, and the August 5, 2021 termination of his employment.

Notably, the Amended Complaint and its exhibits are bereft of *any* comments by VCBR management regarding Mr. Dimaano's diabetes other than Mr. Baugh's assurance that he had "spoken to the night shift Facility Manager about [Mr. Dimaano's] medical accommodations and they will try their level best to get [him] relief in a timely manner."  (ECF No. 29-2, at 1.)  Faced with Mr. Dimaano's bare allegations, the Court would be required to "speculate" to "fill in the gaps" regarding Mr. Baugh's motive to discharge him. *See Kelly*, 90 F.4th at 169.  Given this, "the circumstances do not warrant a reasonable inference of discrimination." *Id.* (citation omitted).  The Court will dismiss Count One. *See Kelly*, 90 F.4th at 171.

### 2.  Mr. Dimaano Fails to State a Claim for Reinstatement Due to Failure to Accommodate in Count II

In Count Two, Mr. Dimaano seeks reinstatement to his former position, attorney's fees under 42 U.S.C. § 1988, and costs of suit due to VCBR's failure to accommodate him under the ADA.  (ECF No. 26 ¶¶ 39–40.)  Although he may barely allege the elements for failure to provide reasonable accommodation, he wholly fails to connect this failure to the termination of his employment.  In so doing, Mr. Dimaano fails to plausibly allege under Count Two that he is

entitled to reinstatement to his former position. The Court will dismiss Count Two of the Amended Complaint to the extent Mr. Dimaano seeks this remedy.

a.    **Legal Standard:  Failure to Accommodate Under the ADA**

Under the ADA, an employer discriminates against an employee by failing to "mak[e] reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability . . . unless [the employer] can demonstrate that the accommodation would impose an undue hardship on the operation of the business[.]" 42 U.S.C. § 12112(b)(5)(A); *Webb*, 2019 WL 2992011, at *2.

To establish a prima facie case for failure to accommodate under the ADA,[12] a plaintiff must show that:  (1) he or she was a qualified individual with a disability; (2) the employer had notice of the disability; (3) with reasonable accommodation he or she could perform the essential functions of the position; and, (4) the employer refused to make such accommodations. *Sumner*, 2016 WL 5852856, at *5 (citing *Rhoads v. F.D.I.C.*, 257 F.3d 373, 387 n.11 (4th Cir. 2001) (considering 12(b)(6) motion to dismiss). Although each element involves a question of fact, *Pandazides v. Va. Bd. of Educ.*, 13 F.3d 823, 833 (4th Cir. 1994), to survive a Rule 12(b)(6) motion to dismiss, a plaintiff must nevertheless allege facts sufficient to state all the elements of a failure to accommodate claim. *See, e.g, Ainsworth v. Loudon Cnty. Sch. Bd.*, 851 F. Supp. 2d 963, 981 (E.D. Va. 2012) (granting motion to dismiss ADA failure to accommodate claim when plaintiff did not allege facts showing that "she requested a reasonable accommodation other than

---

[12] Courts apply the same analysis to claims for failure to accommodate under both the ADA and the Rehabilitation Act. *Lewis v. Gibson*, 621 F. App'x 163, 164 (4th Cir. 2015) (citing cases). Accordingly, the Court may rely upon the guidance of courts examining claims under either statute to analyze the elements of Mr. Dimaano's failure to accommodate claim. *Id.*; *see also Sumner v. Mary Washington Healthcare Physicians*, No. 3:15CV42 (MHL), 2016 WL 5852856, at *5 (E.D. Va. Sept. 30, 2016).

leave," or facts showing that "such a request was ever denied") (citation omitted)); *Webb*, 2019 WL 2992011, at *2 n.2 (whether an accommodation is reasonable is a question of fact, and therefore cannot be decided at the motion to dismiss stage).

Finally, a failure to accommodate supports a claim for reinstatement only where the alleged absence of the accommodation caused the plaintiff's discharge. *See, Holmes v. Wal-Mart Stores East, L.P.*, No. 1:10-cv-75 (TSE), 2011 WL 1842868, at *9 (E.D. Va. Apr. 27, 2011) (where plaintiff failed to plausibly allege that employer's failure to accommodate her disability caused her constructive discharge, she failed to "adequately allege a basis for obtaining back pay and reinstatement," thus, her complaint was "appropriately dismissed to the extent that she requests those remedies.")

**b.    Mr. Dimaano Fails to Connect a Lack of Accommodation to His Termination**

The Court has earlier found that Mr. Dimaano satisfies what are elements one and three in Count Two, his Failure to Accommodate claim. Mr. Dimaano sufficiently states that he is a qualified individual with a disability who, with or without reasonable accommodation, can perform the essential functions of his position, satisfying elements one and three of Count Two. Mr. Dimaano does not provide specific details about the "essential functions" of his role, but, despite Defendants' argument otherwise, he does not need to.[13] *See, e.g.*, *Webb*, 2019 WL 2992011, at *2; *Jones*, 16 F. Supp. 3d at 632.

---

[13] Defendants cite to *Scaff v. Gap, Inc.,* 673 F. Supp. 3d 887, 901–02 (M.D. Tenn. 2023), to support their position that the Court should dismiss Count Two because Mr. Dimaano "alleges no facts showing that he was unable to perform the essential functions of his job at any point as a result of the absence of an accommodation." (ECF No. 28, at 11–12.) *Scaff* is a summary judgment opinion applying a test articulated by the United States Court of Appeals for the Sixth Circuit for analyzing failure to accommodate claims under the ADA. *See* 673 F. Supp. 3d at 904 (citing *Whitfield v. Tennessee*, 639 F.3d 253, 259 (6th Cir. 2011)). This Court is not bound by

Mr. Dimaano also readily satisfies the second element of Count Two: whether the employer had notice of the disability. Mr. Dimaano alleges that he "disclosed . . . to VCBR management prior to starting employment" that he is "a diabetic and must self-administer insulin injections five times per day." (ECF No. 26 ¶ 11.) He adds that "[a]s an accommodation for his disability, [he] took brief breaks at approximately 11:00 pm in order to administer an insulin injection." (ECF No. 26 ¶ 12.) Thus, taken as true, Mr. Dimaano has adequately plead that VCBR had notice of Mr. Dimaano's disability, satisfying the second element of Count Two.

Turning to the fourth and final element, the Court considers whether Mr. Dimaano has plausibly alleged that VCBR refused to accommodate his disability. He has—although just barely. Mr. Dimaano was "frequently left without relief" that "prevented him from taking his insulin injections", but identifies only two instances where a lack of mid-shift relief delayed his ability to take an insulin shot by approximately two hours. (ECF No. 26 ¶¶ 12–15; ECF No. 29-1, at 1; ECF No. 29-2, at 1–2). In support of their Motion to Dismiss, Defendants not unfairly emphasize that Mr. Dimaano cites only "two isolated incidents in which he did not timely receive relief to facilitate his insulin break in the midst of alleged severe staffing shortages . . . and the global COVID-19 pandemic." (ECF No. 30, at 8.)

The question of whether an accommodation is reasonable, however, as Defendants themselves acknowledge, (ECF No. 30 at 8), is a question of fact, and therefore it is not appropriate to consider this argument at this stage of the litigation. *See Pandazides*, 13 F.3d at 833; *Webb*, 2019 WL 2992011, at *2 n.2. Because Mr. Dimaano alleges that he was "frequently left without relief" to take his insulin injections due to chronic staffing shortages, and

---

Sixth Circuit precedent, nor does it find *Scaff*'s summary judgment analysis particularly relevant to resolving a motion to dismiss given the different procedural posture. *See id.* at 904–06.

26

because he identifies two instances in which he did not receive his requested accommodation, he alleges—just barely—that VCBR "refused to make such reasonable accommodations." *See Sumner*, 2016 WL 5852856, at *5. Thus, Mr. Dimaano plausibly alleges that VCBR failed to accommodate his disability.

However, Mr. Dimaano seeks reinstatement as relief for his failure to accommodate claim in Count II. His claim must be dismissed even at this procedural juncture to the extent that Mr. Dimaano requests reinstatement. As relief for the failure to accommodate, Mr. Dimaano requests reinstatement to his former position, attorney's fees, and costs of suit. (ECF No. 26 ¶ 40.) To be entitled to reinstatement, Mr. Dimaano must plausibly allege that the failure to provide his requested accommodation caused his termination. *See Holmes*, 2011 WL 1842868, at *8. Mr. Dimaano has not done so here. As discussed in detail Section III.A.1, Mr. Dimaano fails to establish that his diabetes is a but-for cause of his termination. *See Kelly*, 90 F.4th at 169. This necessarily means that Mr. Dimaano cannot plausibly allege that the absence of his requested accommodation caused his termination. Mr. Dimaano does not even attempt to allege that any lack of accommodation negatively impacted his job performance. Rather, Mr. Dimaano flatly states that "[a]s a result of being unable to administer his insulin injections during breaks, his diabetes worsened" and his blood sugar oscillated, causing him to "suffer[] body shakes." (ECF No. 26 ¶ 14.) He does not connect these side effects to his job performance or his termination.

As such, Mr. Dimaano fails to plausibly allege that VCBR's failure to accommodate his disability caused his termination, or even contributed to it, and therefore fails to plausibly allege that he is entitled to reinstatement under Count Two. *See Holmes*, 2011 WL 1842868, at *8–*9. The Court will dismiss Count Two of the Amended Complaint to the extent Mr. Dimaano seeks

reinstatement.  (ECF No. 26.)  Count Two of the Amended Complaint will remain to the extent Mr. Dimaano requests attorney's fees and costs of suit.

### 3.  Mr. Dimaano Fails to State a Claim for Retaliation under the ADA

In Count Three, Mr. Dimaano contends that Mr. Baugh terminated him in retaliation for complaining about VCBR's failure to accommodate.  (ECF No. 26 ¶ 41.)  Mr. Dimaano fails to state this claim because he fails to plausibly allege a causal link between his complaints regarding his lack of accommodation and his termination.  The Court will dismiss Count Three. (ECF No. 26.)

### a.  Legal Standard:  Retaliation under the ADA

The ADA provides:  "No person shall discriminate against any individual because such individual has opposed any act or practice made unlawful by this chapter or because such individual made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this chapter."  42 U.S.C. § 12203(a).

To state a prima facie retaliation claim under the ADA, a plaintiff has the burden to show that (1) he or she engaged in protected conduct, (2) he or she suffered an adverse action, and (3) a causal link exists between the protected conduct and the adverse action.  *Rhoads v. F.D.I.C.*, 257 F.3d 373, 392 (4th Cir. 2001); *Jones*, 16 F. Supp. 3d at 635 (same).  At the motion to dismiss stage, "a plaintiff need not allege facts that rise to the level of a *prima facie* case of retaliation", but he or she "must 'allege facts sufficient to state all the elements of [his or] her claim.'" *Hanson–Hodge v. Colvin*, No. 1:14-CV-744 (LO), 2015 WL 12516768, at *2 (E.D. Va. May 12, 2015) (quoting *Bass v. E.I. DuPont de Nemours & Co.*, 324 F.3d 761,765 (4th Cir. 2003)).

Regarding the first element of protected conduct, for the purposes of the ADA, "protected activity" can include submitting a request for an accommodation.  *Haulbrook v. Michelin N. Am.*,

252 F.3d 696, 706 (4th Cir. 2001); *Jacobs v. N.C. Admin. Off. of the Cts.*, 780 F.3d 562, 577 (4th Cir. 2015) (plaintiff "clearly engaged in protected activity by submitting a request for accommodation").

Regarding the third element, to adequately plead a causal link between the protected activity and adverse action, a plaintiff's allegations "must raise the inference that the employer took the adverse employment action *because* the plaintiff engaged in protected activity." *Evans v. Larchmont Baptist Church Infant Care Ctr., Inc.*, No. 2:11CV306 (FBS), 2012 WL 699529, at *5 (E.D. Va. Feb. 29, 2012) (emphasis in original) (citing *Dowe v. Total Action Against Poverty in Roanoke Valley*, 145 F.3d 653, 657 (4th Cir. 1998)). Temporal proximity between a plaintiff's protected activity and an adverse employment action *alone* is insufficient to establish that the protected activity was the "but-for" cause of the adverse action. *See Staley v. Gruenberg*, 575 F. App'x 153, 156 (4th Cir. 2014) ("Although Staley's non-conversion occurred shortly after she filed the formal EEOC complaint, this temporal proximity alone is not sufficient to establish that her engagement in protected activity was a 'but[-]for' cause of her non-conversion."); *see also Pascual v. Lowe's Home Ctrs., Inc.*, 193 F. App'x 229, 233 (4th Cir. 2006) (finding a three- to four-month gap insufficient to establish causal connection between protected activity and an adverse action by temporal proximity alone).

> **b.** **Mr. Dimaano Fails to Establish that VCBR Terminated His Employment Due to His Complaints Regarding a Lack of Accommodation**

Mr. Dimaano satisfies element one by alleging that he engaged in protected conduct by "frequently" complaining "of the lack of mid-shift relief to his superiors" which prevented him from self-administering insulin injections, and by identifying two instances in which he complained to VCBR management regarding this issue. (ECF No. ¶ 12; ECF No. 29-1, at 1;

ECF No. 29-2, at 1–2.) He satisfies element two when alleging that on August 5, 2021, he was terminated. (ECF No. ¶ 27.) He fails, however, to plausibly allege a causal link between his protected conduct and his termination of employment, and thereby fails to satisfy element three.

On March 28, 2021 and April 28, 2021, Mr. Dimaano engaged in protected activity by complaining to VCBR management regarding his lack of accommodation.[14] (ECF No. 26 ¶ 12; ECF No. 29-1, at 1; ECF No. 29-2, at 1–2.) Both complaints occurred months before Mr. Dimaano's admitted mid-June 2021 contact with a former resident, July 3, 2021 investigation, and August 5, 2021 termination.[15] *See Pascual*, 193 F. App'x at 233 (three- to four- month gap

---

[14] Mr. Dimaano asks the Court to infer retaliation based on the temporal proximity between his July 12, 2021 email, (which this Court cannot consider as alleged), his July 20, 2021 Due Process Notice, and his August 5, 2021 termination of employment, contending that "when there is no other factual basis to infer retaliation", his "temporal proximity argument is applicable." (ECF No. 29, at 12.) Mr. Dimaano does not cite any case law to support this position. Even considering these events, temporal proximity between a plaintiff's protected activity and an adverse employment action alone is insufficient to establish that the protected activity was the "but-for" cause of the adverse action. *See Staley*, 575 F. App'x at 156; *see also Pascual*, 193 F. App'x at 233.

Also, Mr. Dimaano's exhibits establish that many of his complaints to VCBR management were unrelated to his need to self-administer insulin at approximately 11:00 p.m. each night. (*See, e.g.*, ECF No. 29-1, at 2 (broadly stating that "[t]he evening shift feels like we are being 'targeted' because we don't want to stay anymore"); ECF No. 29-2, at 2 (stating that he was unable to stay beyond his scheduled shift because he "just had a death in the family" and his family was "conducting online Masses and Novena prayers for the departed twice daily for 9 days"); ECF No. 29-3, at 1 (stating that he required shift relief because he had a cardiac imaging appointment the next morning).)

[15] Mr. Dimaano contends that United States Court of Appeals for the Fourth Circuit applies a "rule of thumb that a gap of four months is sufficient to infer a retaliatory motive." (ECF No. 29, at 12 (citing *Staley*, 575 F. App'x at 156).) The Court finds no support for this position in *Staley*. *See Staley*, 575 F. App'x at 156; *see also Pascual*, 193 F. App'x at 233 (finding a three- to four- month gap insufficient to establish causal connection between protected activity and an adverse action by temporal proximity alone).

insufficient to establish causal connection between protected activity and an adverse action by temporal proximity alone).

Although Mr. Dimaano need not allege facts that rise to the level of a prima facie case of retaliation, he still must plausibly allege that Mr. Baugh terminated him *because* he engaged in protected activity. *See Evans*, 2012 WL 699529, at *5. For the reasons discussed in detail in Section III.A.1.b., *supra*, Mr. Dimaano fails to plausibly allege that Mr. Baugh terminated his employment because he engaged in protected activity rather than due to non-discriminatory reasons.[16] Notably, the Amended Complaint and its exhibits are entirely bereft of *any* comments from VCBR management regarding Mr. Dimaano's protected activity other than Mr. Baugh's comment that he has "spoken to the night shift Facility Manager about [Mr. Dimaano's] medical accommodations and they will try their level best to get [him] relief in a timely manner." (ECF No. 29-2, at 1.) Mr. Dimaano provides no factual allegations from which the Court can reasonably infer a causal link between his protected activity and his termination. The Court will dismiss Count Three.

### B.    Mr. Dimaano Fails to State a Claim under Title VII in Counts Four, Five, and Six of His Amended Complaint

Mr. Dimaano brings Counts Four, Five, and Six of the Amended Complaint under Title VII against VCBR for: (1) discharging him due to "his Asian race"; (2) discharging him due to his "Filipino national origin"; and (3) for terminating him because of his complaints of disparate

---

[16] Mr. Dimaano asks the Court to find a retaliatory motive where "VCBR exaggerated [Mr.] Dimaano's contact with the former resident, and made it appear that [Mr.] Dimanno [*sic*] had initiated the contact intentionally." (ECF No. 29, at 12.) Even at this procedural juncture, the Court will not do so where, as discussed in Section III.A.1, Mr. Dimaano's exhibits suggest non-discriminatory reasons for his termination of employment, and where Mr. Dimaano acknowledges that although he "was not aware that [his] actions violated [VCBR's] Facility Instructions", he "[u]understand[s] that ignorance of the rule does not excuse [him]." (ECF No. 29-5, at 1.)

treatment due to "his Asian race and Filipino national origin." (ECF No. 26 ¶¶ 43, 45, 47.)  Mr. Dimaano fails to state a claim under Title VII under any theory he articulates.

### 1.    <u>VCBR is Not an Entity Capable of Being Sued</u>

As a threshold matter, under Virginia law, VCBR is not an entity capable of being sued because it has no independent identity separate from that of the Virginia Department of Behavioral Health and Development Services ("DBHDS").  As a result, none of Mr. Dimaano's claims against VCBR can survive.

### a.    <u>Legal Standard:  VCBR's Capacity to Be Sued</u>

"Where a party is neither an individual nor a corporation, the party's capacity to be sued is determined by the law of the state where the federal district court sits." *Smith v. Town of South Hill*, 611 F. Supp. 3d 148, 166 (E.D. Va. 2020) (citations and internal quotation marks omitted); *see also* Fed. R. Civ. P. 17(b)(3).[17]  Under Virginia law, "'an operating division of a governmental entity . . . cannot be sued unless the legislature has vested the operating division with the capacity to be sued.'"  *Id.* at 167 (quoting *Mukuna v. Gibson*, No. 1:11CV493 (LMB), 2011 WL 3793336, at *5 (E.D. Va. Aug. 25, 2011)); *see also Johnson v. Univ. of Va. Med. Ctr.*, No. CIV 306CV00061, 2007 WL 137111, at *4 (W.D. Va. Jan. 17, 2007) (where defendant was a division of the Rector and Visitors of the University of Virginia, which itself is an agency of the Commonwealth of Virginia, defendant was not a legal entity capable of being sued).

Chapter 9 § 37.2-900 *et seq.* of the Virginia Code governs the civil commitment of sexually violent predators.  In this section of the Virginia Code, "Department" refers to DBHDS.  Va. Code § 37.2-900.  Virginia Code § 37.2-909(A) provides in relevant part that DBHDS "shall

---

[17] Rule 17 provides that where a party is neither an individual nor a corporation, "[c]apacity to sue or be sued is determined . . . by the law of the state where the court is located[.]"  Fed. R. Civ. P. 17(b)(3).

provide such control, care, and treatment at a secure facility" for individuals committed pursuant to Va. Code § 37.2-900 *et seq.* Va. Code § 37.2-909(A). DBHDS executes this mandate by operating VCBR. *See, e.g.*, (ECF No. 26 ¶ 2); *Brown v. Ferguson*, No. 7:21CV00043, 2021 WL 1377361, at *1 (W.D. Va. Apr. 12, 2021) (observing defendant was sentenced to involuntary inpatient sex offender treatment at VCBR, in the custody of DBHDS).

### b.    VCBR is Not a Legal Entity that May Be Sued

As an operating division of DBHDS, VCBR has no capacity to be sued absent statutory authority. *See Smith*, 611 F. Supp. 3d at 167. In his opposition, Mr. Dimaano identifies no authority to the contrary, nor does he contest Defendants' argument that VCBR lacks capacity to be sued. (*See* ECF No. 29, at 12.)[18] As a result, the remaining Counts (Counts IV, V, and VI) cannot succeed.

### 2.    Mr. Dimaano Fails to State a Claim Under Title VII

Mr. Dimaano requests that if VCBR is an improper defendant, the Court grant him "leave to amend his complaint to substitute DBHDS as the proper party defendant." (ECF No. 29, at 12.) Mr. Dimaano, however, fails to state a claim under Title VII under any theory he articulates. Thus, his Title VII claims would still founder even if the Court allowed a substitution of DBHDS for VCBR and even if the Title VII allegations against DBHDS in the Second Amended Complaint related back to filing of the original Complaint.[19] As a result, a

---

[18] Instead, Mr. Dimaano states that "[t]o the extent [Defendants' position] is accurate, [Mr.] Dimaano requests leave to amend his complaint to substitute DBHDS as the proper party defendant." (ECF No. 29, at 12.) Because granting this request would be futile, the Court will deny it. The Court discusses this request in more detail in Section III.B.2, *infra*.

[19] Mr. Dimaano and Defendants disagree regarding whether the filing of a Second Amended Complaint would relate back to the original complaint, and thus whether Mr. Dimaano's Title VII claims against DBHDS would be time barred. (ECF No. 29, at 12; ECF No.

Second Amended Complaint would be futile, and the Court will deny Mr. Dimaano's second

request for leave to amend.

> **a.     Mr. Dimaano Fails to State a Claim for Racial or National**
>           **Origin Discrimination Under Title VII**

Turning to Counts Four and Five, the Court considers whether Mr. Dimaano has stated a

claim for race discrimination in violation of Title VII (Count Four) or a claim for national origin

discrimination in violation of Title VII (Count Five). He has not. Although Mr. Dimaano

provides naked assertions of discrimination, he provides no information about the race or

national origin of other VCBR employees or of his replacement. He also does not allege how

other VCBR employees he claims were treated differently from him were also similarly situated

to him. Finally, Mr. Dimaano does not plausibly allege that at the time of his discharge, he was

performing at a level that met VCBR's legitimate expectations. In so doing, he fails to allege

sufficient facts to meet the statutory elements of either claim.

> **i.      Legal Standard:  Racial or National Origin**
>            **Discrimination Under Title VII**

Under Title VII, employers may not "discharge any individual, or otherwise to

discriminate against any individual with respect to his compensation, terms, conditions, or

privileges of employment, because of such individual's race . . . or national origin[.]" 42 U.S.C.

§ 2000e–2(a)(l).

"'The elements of a . . . Title VII discrimination claim are:  (1) membership in a protected

class; (2) satisfactory job performance; (3) adverse employment actions; and, (4) different

treatment from similarly situated employees outside of the protected class.'" *Burr v. Campbell*,

---

30, at 11–12.) Because Mr. Dimaano fails to state any claim under Title VII, the Court need not,
and does not, consider this question.

No. 3:21CV403 (MHL), 2022 WL 982236, at *4 (E.D. Va. Mar. 30, 2022) (cleaned up) (quoting *Coleman v. Md. Ct. of Appeals*, 626 F.3d 187, 190 (4th Cir. 2010)) (considering 12(b)(6) motion to dismiss); *see also Wilcox v. Transmodal Sols., LLC*, 473 F. Supp. 3d 574, 582 (E.D. Va. 2020) (considering motion for default judgment).

"In the context of a Title VII case, 'an employment discrimination plaintiff need not plead a prima facie case of discrimination' to survive a motion to dismiss." *Bing v. Brivo Sys., LLC*, 959 F.3d 605, 616 (4th Cir. 2020) (quoting *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 515 (2002)); *see also Martinez v. Constellis, LLC*, No. 3:19CV720 (MHL), 2020 WL 4589194, at *3 (E.D. Va. Aug. 10, 2020) (considering 12(b)(6) motion to dismiss). "Instead, a Title VII plaintiff is 'required to allege facts to satisfy the elements of a cause of action created by that statute.'" *Bing*, 959 F.3d at 616 (quoting *McCleary-Evans v. Md. Dep't of Transp., State Highway Admin.*, 780 F.3d 582, 585 (4th Cir. 2015)). When determining if a plaintiff has pleaded sufficient plausible facts to establish a violation of Title VII, the inquiry "is whether [the plaintiff] alleges facts that plausibly state a violation of Title VII 'above a speculative level.'" *Id.* at 617 (quoting *Coleman*, 626 F.3d at 190). The Court, therefore, does not require proof of all of the elements of a prima facie case of racial discrimination, but requires that plaintiffs plausibly meet these elements. *See id.* at 617 n.8 (recognizing the elements of a prima facie case of discrimination under Title VII); *Martinez*, 2020 WL 4589194, at *3 (accord).

"To meet the fourth element of a Title VII discrimination claim, a plaintiff must plausibly establish 'different treatment from similarly situated employees outside the protected class.'" *Martinez*, 2020 WL 4589194 at *4 (quoting *Coleman*, 626 F.3d at 190). "Although this standard does not require the plaintiff as a matter of law to point to a similarly situated comparator to succeed on a discrimination claim, if a plaintiff bases his or her allegations completely upon a

35

comparison to an employee from a non-protected class, then the validity of his or her prima facie

case depends upon whether that comparator is indeed similarly situated." *Id.* (cleaned up) (citing

*Haywood v. Locke*, 387 F. App'x 355, 359 (4th Cir. 2010) and *Lawrence v. Glob. Linguist Sols.*

*LLC*, No. 1:13CV1207 (JCC), 2013 WL 3729266, at *4 (E.D. Va. Dec. 19, 2013)).  A plaintiff

must show that he or she is "similar in all relevant respects to [his or her] comparator."

*Haywood*, 387 F. App'x at 359.  Employees are similarly situated where they "dealt with the

same supervisor, [were] subject to the same standards and . . . engaged in the same conduct

without such differentiating or mitigating circumstances that would distinguish their conduct or

the employer's treatment of them for it." *Id.*  "Thus, to plausibly state a claim for discrimination

a plaintiff must 'do more than make a general accusation that he [or she] was treated differently

as a result of his [or her] race' as compared to someone outside the protected class." *Martinez*,

2020 WL 4589194, at *4 (alteration in original) (internal quotation marks and citation omitted)).

> **ii.    Mr. Dimaano Fails to Establish that His Performance**
> **Level Satisfied VCBR's Legitimate Expectations, and**
> **Fails to Establish that VCBR Treated Him Differently**
> **Than Similarly-Situated Non-Asian, Non-Filipino**
> **Employees**

Mr. Dimaano fails to plausibly allege elements two or four of a claim for racial or

national origin discrimination, and thus fails to state a claim under Counts Four and Five.  First,

for the reasons discussed in Section III.A.1.b., *supra*, Mr. Dimaano fails to plausibly allege that

at the time of his discharge, he was performing at a level that met VCBR's legitimate

expectations, and therefore fails to plead satisfactory job performance.  Second, Mr. Dimaano

fails to allege facts to plausibly show that Defendants treated similarly-situated individuals of

non-Asian or non-Filipino descent more favorably.

In support of his argument that he states a claim for both racial and national origin

36

discrimination, Mr. Dimaano emphasizes that in his July 12, 2021 email to VCBR management, he writes that "other SSTT[]s are regularly reli[e]ved during their shifts, but he is not", and "that while other SSTT[]s were in a meeting discussing grievances with facility operations, only [Mr.] Dimaano was written up for 'attempting to unionize the SSTT.'" (ECF No. 29, at 14 (quoting ECF No. 29-3, at 1).)[20] He further notes that in his July 12, 2021 email, he asked if he were being "'singled out'" because he is Asian. (ECF No. 29, at 14 (quoting ECF No. 29-3, at 1).) In further support of this argument, he also points to his allegation that during the July 2, 2021 investigation into his contact with a former VCBR resident, VCBR's Director of Security told Mr. Dimaano: "'I really don't care where you came from, but this is how we do it here.'" (ECF No. 29, at 15 (citing ECF No. 26 ¶ 19).) Mr. Dimaano "construed [this] comment as disparagingly referring to his Asian ancestry", (ECF No. 26 ¶ 19), because he had "endured such disparate treatment as compared to his non-Asian co-workers." (ECF No. 29, at 15.) Mr. Dimaano's Amended Complaint and exhibits, however, are entirely silent regarding the race or national origin of Mr. Dimaano's former co-workers, or how his former co-workers were similarly situated to Mr. Dimaano.

Mr. Dimaano's allegations fall well short of those needed to establish that he was treated differently from similarly situated non-Asian or non-Filipino employees. He alleges no information about the race or national origin of any other VCBR employee or his replacement, thereby failing to plausibly plead element four of Counts Four and Five and leaving the Court

---

[20] The Court sees no allegation in the Amended Complaint, Exhibit 3, or anywhere else clarifying that this write-up occurred "while other SSTT[s] were in a meeting discussing grievances with facility operations." (ECF No. 29, at 14.) "It is well-established that parties cannot amend their complaints through briefing." *S. Walk at Broadlands Homeowner's Ass'n, Inc. v. OpenBand at Broadlands, LLC*, 713 F.3d 175, 184 (4th Cir. 2013).

unable to conclude that disparate treatment occurred due to race or national origin.[21]  His

allegation as to VCBR's Director of Security Nathan Moore's comment "[i]n the course of an

interview" regarding a violation of VCBR policy does not allow this Court to reasonably infer

that it was race-based. (ECF No. 26 ¶ 19; ECF No. 29-4, at 1.)  For instance, although Mr.

Dimaano asks in a single email to VCBR management if he was "singled out" because he is

Asian, (ECF No. 29-3, at 1), he also speculates to VCBR management that he was "singled out"

because he worked on a project for VCBR and declined to work overtime. (ECF No. 29-2, at 2.)

More broadly, Mr. Dimaano states that "[t]he evening shift feels like we are being 'targeted'

because we don't want to stay anymore." (ECF No. 29-1, at 2.)  These alternative theories for

why he felt "singled out", provided by Mr. Dimaano himself, do not plausibly support a claim of

bias due to race or national origin.

 Although Mr. Dimaano "need not prove a prima face case of discrimination at the Motion

to Dismiss stage, he must do more than more than make a general accusation that he was treated

differently as a result of his race as compared to someone outside of his protected class." *See*

---

[21] Although this deficiency alone could doom Mr. Dimaano's claims in Counts Four and Five, the Court also observes that he fails to allege sufficient facts to plausibly allege that any of his former co-workers were similarly situated to him. Mr. Dimaano merely contends that "other SSTT units were afforded breaks" when he was not, and that he was disciplined while other SSTTs were not. (ECF No. 26 ¶¶ 15, 22; ECF No. 29-3, at 1.)  He provides no allegation as to whether other SSTTs (1) dealt with the same supervisor; (2) were subject to the same standards; or, (3) engaged in the same conduct as Mr. Dimaano without such differentiating or mitigating circumstances that would distinguish their conduct or VCBR's treatment of them for it. *See Haywood*, 387 F. App'x at 359; *see also Martinez*, 2020 WL 4589194, at *4. Mr. Dimaano contends that he "stated that while other SSTT[s] were in a meeting discussing grievances with facility operations, only [Mr.] Dimaano was written up for 'attempting to unionize the SSTT.'" (ECF No. 29, at 14 (citing ECF No. 26 ¶ 22; ECF No. 29-3).)  Although Mr. Dimaano states in Exhibit 3 that he was "written up . . . for attempting to unionize the SSTT[s]", as explained in note 20, the Court finds no allegation in the Amended Complaint, Exhibit 3, or anywhere else, clarifying that this write-up occurred "while other SSTT[s] were in a meeting discussing grievances with facility operations." (ECF No. 29, at 14.)

*Martinez*, 2020 WL 4589194 at *4 (cleaned up).  Where Mr. Dimaano only makes a general

accusation that he was treated differently as a result of his race or national origin and fails to

allege any information about the race or national origin of any other employee at VCBR, or how

any other non-Asian, non-Filipino employee at VCBR was similarly situated to him, he falls far

short of plausibly alleging disparate treatment.

In sum, Mr. Dimaano's "naked assertions of wrongdoing" must be accompanied by

"some factual enhancement within the complaint to cross the line between *possibility* and

*plausibility* of entitlement to relief."  *See Francis v. Giacomelli*, 588 F.3d 186, 193 (4th Cir.

2009) (quoting *Twombly*, 550 U.S. at 557) (internal quotation marks omitted) (emphasis added).

He utterly fails to provide such factual enhancement here, and therefore fails to state a claim of

discrimination under Counts Four or Five.

### b.  Mr. Dimaano Fails to State a Claim for Retaliation Under Title VII

In Count Six, Mr. Dimaano contends that VCBR terminated his employment in

retaliation for complaining "of disparate treatment [due to] his Asian race and Filipino national

origin."  (ECF No. 26 ¶ 47.)  Mr. Dimaano fails to plausibly allege that VCBR terminated him

due to protected activity, and therefore fails to state a claim under Count Six.

### i.      Legal Standard:  Retaliation Under Title VII

Title VII prohibits employers from "discriminat[ing] against any of [their] employees . . .

because [the employees] ha[ve] opposed any practice made an unlawful employment practice by

[Title VII], or because [the employees] ha[ve] . . . participated in any manner in an

investigation." 42 U.S.C. § 2000e–3(a).

The elements of a prima facie retaliation claim are:  (1) engagement in a protected

activity, (2) adverse employment action, and (3) a causal link between the protected activity and the employment action. *See Mackey v. Shalala*, 360 F.3d 463, 469 (4th Cir. 2004); *see also Barnhill v. Garland*, 636 F. Supp. 3d 592, 607 (E.D. Va. 2022) (considering 12(b)(6) motion to dismiss). In the context of element one of a retaliation claim, to constitute protected activity, an "employee must complain about activity that constitutes unlawful discrimination under Title VII, rather than about unfair treatment generally." *Conyers v. Va. Housing Dev. Auth.*, 927 F. Supp. 2d 285, 295 (E.D. Va. 2013) (citing, *inter alia*, *Mixon v. Charlotte-Mecklenburg Sch.*, 3:11-cv-228-MOC-DSC, 2011 WL 5075808, at *6 (W.D.N.C. Aug. 5, 2011) ("Title VII requires that employees provide some kind of notice to their employer that they are complaining about prohibited practices covered by [Title VII]. Generalized complaints about disputes or annoyances in the workplace are insufficient.")).

"[E]stablishing a 'causal relationship' at the prima facie stage isn't an onerous burden." *Thomas v. City of Annapolis, Md.*, 851 F. App'x 341, 350 (4th Cir. 2021). An employee may satisfy his or her burden "simply by showing that (1) the employer either understood or should have understood the employee to be engaged in protected activity and (2) the employer took adverse action against the employee soon after becoming aware of such activity." *Strothers v. City of Laurel, Md.*, 895 F.3d 317, 336 (4th Cir. 2018). In other words, "some degree of temporal proximity to suggest a causal connection" must exist between the protected activity and the adverse action. *Constantine v. Rectors & Visitors of George Mason Univ.*, 411 F.3d 474, 501 (4th Cir. 2005). "[W]here timing is the only basis for a claim of retaliation, and gradual adverse job actions began well before the plaintiff had ever engaged in any protected activity, an inference of retaliation does not arise." *Francis v. Booz, Allen & Hamilton, Inc.*, 452 F.3d 299, 309 (4th Cir. 2006).

          **ii.**      **Mr. Dimaano Fails to Establish that He Was Retaliated Against Because of Protected Activity**

Mr. Dimaano argues that VCBR terminated him on August 5, 2021 because of a single statement he made in his July 12, 2021 email to VCBR management. (ECF No. 29, at 15.) In this email, Mr. Dimaano raises a host of generalized complaints about his working conditions, complains about a chronic lack of end-of-shift relief, notes that management frequently fails to inform him about the status of his end-of-shift relief, and asks: "Is it because of my race being Asian that I am being singled out?" (ECF No. 29-3, at 2.) Mr. Dimaano argues that this question constitutes "protected activity" and asks the Court to infer a causal link between this question and his August 5, 2021 termination due to their "temporal proximity" of "just three weeks." (ECF No. 29, at 15–16.)

As explained above, Title VII requires that employees provide some kind of notice to their employer that they are complaining about prohibited practices covered by Title VII. Generalized complaints about disputes or annoyances in the workplace are insufficient. *Conyers*, 927 F. Supp. 2d at 295 (plaintiff's email complaining to employer did not constitute protected activity where "nowhere" in the email did she "claim that [she] is being discriminated against because of her race and/or sex.") In his July 12, 2021 email, Mr. Dimaano raises a host of generalized complaints, and further writes that he harbors "so much frustration and reservation towards my night shift supervisor", and "[a]t times, it even makes [him] think that they are retaliating for some slight [he] may have committed." (ECF No. 29-3, at 2.) He does however, also ask if he was being "singled out" because he is Asian. (ECF No. 29-3, at 2.) Because Mr. Dimaano's email at least raises the issue of race and provides speculation of racial discrimination, he plausibly alleges, *barely*, that his July 12, 2021 email constitutes protected activity. *See* 927 F. Supp. 2d at 295.

41

But even if Mr. Dimaano's July 12, 2021 email constitutes protected activity, he fails to plausibly allege a causal link between this protected activity and his August 5, 2021 termination. For the reasons discussed in detail above, *see* Section III.A.1.b., *supra*, Mr. Dimaano does not plausibly allege that at the time of his termination or at the time of his July 12, 2021 email, he was performing at a level that met VCBR's legitimate expectations. Critically, VCBR's July 2, 2021 investigation into Mr. Dimaano's text exchange with a former resident predates Mr. Dimaano's July 12, 2021 email. (ECF No. 26 ¶ 19.)[22] This strongly militates against an inference that the July 12, 2021 email triggered Mr. Dimaano's August 5, 2021 termination. *See Francis*, 452 F.3d at 309 ("[W]here timing is the only basis for a claim of retaliation, and gradual adverse job actions began well before the plaintiff had ever engaged in any protected activity, an inference of retaliation does not arise.").

### IV.  Conclusion

For the reasons articulated above, the Court will grant in part and deny in part Defendants' Motion to Dismiss. (ECF No. 27.) Because Mr. Dimaano has already had the chance to amend his Complaint, to the extent the Court grants Defendants' Motion to Dismiss, it will do so with prejudice.

An appropriate Order shall issue.

Date: 8/13/24                                                            /s/
Richmond, Virginia                                    M. Hannah Lauck
                                                               United States District Judge

----

[22] Mr. Dimaano argues that he "can show that he was meeting his employer's performance expectations because he received a positive performance rating of 'Contributor' on July 7, 2021, just 5 days prior to his protected activity." (ECF No. 29, at 16.) For the reasons stated in footnote 11, the Court is not persuaded by this argument.